No. 47,545

In the Matter of the Estate of Doris Dianne Minney, Deceased; GEORGE KIDDER and DOROTHY KIDDER, Claimants, *Appellants,* v. GORDON MINNEY, Administrator, *Appellee.*

(531 P. 2d 52)

Opinion filed January 25, 1975.

*Robert A. Creighton,* of Brown & Creighton, of Atwood, argued the cause and was on the brief for the appellants.

*Raymond L. Dahlberg,* of Turner, Chartered, of Great Bend, argued the cause, and *Thomas C. Kelly* and *William A. Hensley,* of the same firm, were with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This case is the outgrowth of a tragic head-on collision occurring on an east-west graveled highway in Rawlins County. Four young persons were killed in the accident. The date was June 28, 1971, the hour, approximately 7:45 p. m.

A unique set of coincidences attended the accident. The east-bound car, a 1964 Plymouth (or Dodge), was driven by Robert W. Haynes. He had two passengers in the back seat of the car, his 15 year-old cousin, Connie Coleen Kidder, and Gail Ferguson, her friend. They were going to a swimming party at the Reeves farm. On their way they stopped at the Higley farm to pick up Lyn Higley. Lyn, who had been driving a tractor that day for Don Jumper, had to return a pickup to the Jumper farm which was about a mile east of Higley's. Lyn started out first, followed by Robert Haynes and his two passengers. Following Robert, came Mrs. Higley, on her way to attend a meeting in Atwood. At about the time the three-car carvan left the Higley farm, a 1970 Ford Thunderbird automobile driven by Doris Dianne Minney, familiarly known as DD, with Lisa Briney as a passenger, was heading west on the same road. DD had phoned Mrs. Higley that morning about taking vocal lessons. She said she was going to Colby and would stop and talk with her later that day. Sometime after 4 p. m. she called again and said it would be a little later than she had planned because her friend needed to pick up some groceries in Colby. Mrs. Higley did not tell DD about her evening meeting in Atwood but thought she could stop her on the road and talk to her. That talk, alas, was not to be.

It was a hot, dry, windless evening and the cars raised clouds of dust, interfering with vision. In the midst of the dense dust the Haynes and Minney cars met nearly head-on some distance west of the Jumper driveway. When the dust and the debris from the wreck had settled, Robert Haynes and his two passengers lay dead, as did Doris Dianne Minney. Lisa Briney, DD's passenger, was the sole survivor. So far as the record before us reveals, Lisa did not testify at the trial.

The parents of Connie Coleen Kidder are plaintiffs in the present lawsuit brought against the estate of Doris Dianne Minney. They allege the deceased was negligent in two respects: (1) in driving at an excessive rate of speed and (2) in driving on the south or wrong side of the highway. The case was tried to a jury which

returned a verdict in favor of the Minney estate, to which we shall refer as defendant. Plaintiffs have appealed, alleging various trial errors.

In general, the evidence tends to support the plaintiffs' claim of excessive speed, it being estimated that the Thunderbird was traveling 64 miles per hour. There was disagreement, however, among the three expert witnesses who testified, as to whether the Minney vehicle was across the center line of the highway although all three agreed the Haynes' car was on the wrong or north side of the road at the time of collision.

As one means of establishing that DD Minney was driving on the south half of the highway, the plaintiffs relied on the location of an oil spill or streak which began seven inches north of the center line and trailed to where the Minney car came to rest on the north side of the road. The plaintiffs contend this oil came from the Minney car and that its location near the center of the highway indicates that a portion of the Minney car was across the center line and on the south half of the roadway at the time of impact. Since three of the points of error relate in one way or another to the oil streak, we quote the following pertinent passages taken from the record:

"DIRECT EXAMINATION of Plaintiff's [expert] Witness, George Forman

. . .

"Q. All right. Now from your examination of this date [sic] involved in this case, do you have an opinion as to the position the oil came from the Dodge Car?

"A. Again, there is no way of precise determining where on the Thunderbird Automobile.

"Q. Excuse me, the Thunder Bird.

"A. Where the oil came from. I don't know where it came from.

"MR. HENSLEY: (interrupting) How would he know? There's transmission fluid, brake fluid, there is oil pans, there is power steering reservoirs, the witness is—

"THE COURT (Interrupting) Are you objecting to it?

"MR. HENSLEY: Yes

"THE COURT: Sustained

"DIRECT EXAMINATION on rebuttal of plaintiff's witness, George Forman

. . .

"Q. Now, you heard the testimony of Officer Smith with regard to oil spill from the Ford seven inches north of the center line of the road, you also heard the testimony of Mr. Razak, he did not consider this in his analysis, do you have an opinion, Mr. Forman, as to what part of the Ford this oil came from?

"MR. HENSLEY: Absolutely no foundation for that opinion. The man never seen the car; he has never been to the scene, no way he can state that.

"THE COURT: Sustained. I think Mr. Smith testified to gouge marks seven inches north of center.

"MR. CREIGHTON: Put him on the stand and he will testify that oil was seven inches north of the center line. It was oil.

"MR. HENSLEY: He also testified when two vehicles come. together in this fashion that oil splatters in every direction. There is no foundation for this witness to now state an opinion as to what part of the Ford the oil came from.

"THE COURT: Objection will be sustained. I don't think there is any foundation.

"MR. CREIGHTON: In light of what the Court said, would the Court reporter read back the answer of the officer so I will know exactly what his testimony was. With regard to the oil, this is a very important point.

"THE COURT: Let's just ask him again. Mr. Smith, did you testify that the oil spill started seven inches north of the center line?

"MR. SMITH: Yes, I did.

"MR. HENSLEY: I still object to foundation regarding witness's ability to testify what part of the car that came from.

"THE COURT: Sustained."

First of all, the plaintiffs contend the trial court erred by misstating the evidence when it sustained Mr. Hensley's objection, and that this discredited their evidence relating to the oil stain. We agree that a presiding judge should maintain a neutral stance throughout the trial of a case and should refrain from expressing his views both as to the weight of testimony and the credibility of witnesses. He must be fair to all sides of a lawsuit and impartial in his rulings. (53 Am. Jur., Trial, §§ 76-79.) It would seem elementary that a trial court, in citing or attempting to quote the testimony of any witness, should take pains to be accurate.

In the present case, however, we believe no prejudice can be said to have resulted from the remarks made by the court. In the first place Officer Smith had testified that both the oil stain and gouge marks were found seven inches north of the center line of the highway. But of more importance, the court asked Officer Smith himself whether he had testified the oil spill was seven inches north of the center line, and this drew the response from Smith "Yes, I did." The jury had the benefit of this revelation, and whatever prejudice might otherwise have resulted from the court's comment would, in our opinion, have been dissipated entirely by the court's follow-up.

For their second point the plaintiffs complain of an incident which occurred during final summation. Mr. Creighton, plaintiffs' counsel, referred in his final argument to a diagram prepared by

Patrolman Smith and said that it clearly showed the oil streak line going to the point of impact (POI) on the diagram. At this juncture Mr. Hensley, defense counsel, objected and called it a "misstatement of the diagram." The plaintiffs contend that Mr. Hensley knowingly misstated the testimony of Officer Smith; that Hensley's misstatement was gross; and that the trial court committed prejudicial error in not correcting him. We believe the claim has no merit. In the first place the trial court correctly stated in open court that it would be up to the jury to determine. Futhermore, Officer Smith had testified that although he had marked the point of impact on the diagram, the place where the cars had first come in contact was some four feet east of that. We believe that neither bad faith nor dishonesty can be imputed to Mr. Hensley, and that the trial court had no occasion to correct or admonish him.

The plaintiffs' third point goes to the trial court's action in sustaining a defense objection to a question put to Mr. Forman calling for his opinion as to what part of the Ford car the oil had come from. The applicable statute, K. S. A. 60-456 (*b*), provides:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions *as the judge finds* are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." (Emphasis supplied.)

In *Taylor v. Maxwell,* 197 Kan. 509, 511, 419 P. 2d 822, we clearly stated the rule:

". . . The qualifications of an expert witness and the admissibility of his testimony are matters within the sound discretion of the trial judge. This principle of law has been previously determined and clearly stated. (*Grohusky v. Atlas Assurance Co.,* 195 Kan. 626, 408 P. 2d 697.)"

See, also, *Lord v. State Automobile & Casualty Underwriters,* 208 Kan. 227, 230, 491 P. 2d 917; *Staudinger v. Sooner Pipe & Supply Corporation*, 208 Kan. 100, 103, 490 P. 2d 619; *Osborn v. Lesser,* 201 Kan. 45, 47, 439 P. 2d 395.

We cannot say judicial discretion was exceeded or abused in this case. Mr. Forman testified there was no precise way to determine where the oil had come from and that he did not know whence it came. It is also to be noted that Mr. Forman did testify during his examination that the Thunderbird car was left of the center of the road at the point of impact.

One other point remains. It concerns the trial court's overruling of a challenge for cause directed against Mr. Johnson. The *voir dire* examination of this potential juror by defense counsel is as follows:

"Mr. CREIGHTON: I will begin with Mr. Johnson

"Mr. JOHNSON: DD was very close to our family all the way through school, and I feel—

"Mr. CREIGHTON: (Interrupting) You couldn't have an open mind?

"Mr. JOHNSON: I couldn't have an open mind. It started in kindergarten clear through high school.

"Mr. CREIGHTON: Your Honor, we ask that Mr. Johnson be excused for cause.

"THE COURT: Well, ladies and gentlemen, now, you are all familiar with the fact in counties the size of Norton and Rawlins and the rest of the counties out here probably most everybody knows everybody in the county, but if you are excused we can't have enough jurors to try this case. Because everyone knows about everyone else, I don't think it is a disqualification to permit them to be excused because we just can't try this case if we are going to disqualify all the jurors that know Mr. and Mrs. Minney. Don't you think, Mr. Johnson,—You understand that Doris Dianne Minney is not a party to the action. She is deceased?

"Mr. JOHNSON: Yes, sir

"THE COURT: Don't you think you can disregard under the circumstances and render a fair and impartial verdict under the law and evidence presented here?

"Mr. JOHNSON: Your Honor, I imagine I could if I had to.

"THE COURT: Well, it isn't a question if you had to; we can't force you to but as I say, you just can't disqualify all of them that know Mr. and Mrs. Minney.

"Mr. JOHNSON: I understand what you are talking about.

"THE COURT: Doris Dianne Minney is not a party to this action. It is the administrator of her estate. Now, do you think you could sit on this case and disregard the fact that you have known this girl that was killed and render a fair verdict according to the law and the evidence?

"Mr. JOHNSON: Yes.

"THE COURT: Objection overruled.

"Mr. CREIGHTON: Mr. Johnson, going further with the questioning in this case in the event you are asked to return a very large verdict against the estate of Doris Dianne Minney, would you follow the Court's instructions and if you find that she is entitled to a large recovery that you will decide in favor of the Kidders and against the estate of Doris Dianne Minney?

"Mr. JOHNSON: Yes"

Subsequently, the plaintiffs challenged Mr. Johnson peremptorily, and he was removed from the jury panel which heard the case.

K. S. A. 1973 Supp. 60-247 (*b*) provides in pertinent part "All challenges for cause or favor, whether to the array or panel or to individual jurors, shall be determined by the court." We have con-

sistently held that under this and predecessor statutes the qualifications of a juror is a matter resting within the sound discretion of the trial court and its ruling with respect thereto will not be reversed absent a showing of an abuse of discretion. (*Soden v. Gemberling*, 188 Kan. 716, 720, 366 P. 2d 235; *Rauscher v. St. Benedict's College*, 212 Kan. 20, 23, 509 P. 2d 1137.) Our decisions in this regard accord with the generally accepted view throughout this country. In 47 Am. Jur. 2d, Jury, § 221, p. 812, we find this statement:

"Generally speaking, rulings on challenges are not reversible error unless prejudicial. Since the trial court has the opportunity of seeing the juror, hearing the testimony, and noting the manner and demeanor of the juror while under examination, its decision as to the juror's qualification will be reversed only when it appears that it has abused its discretion. . . ."

The rule is well exemplified in *Critchfield v. Ernzen*, 181 Kan. 284, 310 P. 2d 930, where citations from a number of our decisions have been set forth:

"On *voir dire* examination two prospective jurors admitted one of appellant's counsel was involved in litigation adverse to their respective interests. Each such juror was challenged for cause. These challenges were overruled on the ground neither juror had admitted prejudice against the appellant. Thereafter both such jurors were excused on peremptory challenges and subsequently no objection was made to the qualifications of any of the jurors who participated in the trial. In the face of what has just been related we are unable to agree with appellant's contention the trial court abused its discretion or committed reversible error in refusing to disqualify the jurors in question.

"See *Parnell v. Security Elevator Co.*, 174 Kan. 643, 258 P. 2d 288, where it is held:

" 'Whether a prospective juror is qualified is addressed to the sound discretion of the trial court on the juror's *voir dire*, and the trial court's determination will not be disturbed unless it appears it abused its discretion.' (Syl. ¶ 1.)

"And *Bailey v. McLeod*, 143 Kan. 638, 56 P. 2d 460, which reads:

" '. . . More than that, Olson did not sit as a juror in the trial of this case, defendants having excused him by a peremptory challenge; hence the error, if any, of the court's ruling on the challenge for cause becomes of but little importance, since no complaint is made of the qualifications of any juror who participated in the trial. (*State v. Hooper*, 140 Kan. 481, 502, 37 P. 2d 52.)' (p. 640.)

"See, also, *State v. Springer*, 172 Kan. 239, 239 P. 2d 944, where it is said:

" 'The constitutional guaranty is that an accused shall be tried by an impartial jury. The matter of peremptory challenges is merely statutory machinery for carrying out and securing the constitutional guaranty. Error in overruling a challenge to a juror is not ground for reversal unless the accused was prejudiced thereby. The real question is: Was the jury which tried defendant composed of impartial members? In the absence of any objection on the part of

defendant to any member as it was finally drawn to try him we cannot say it was not impartial.' (p. 245.)" (pp. 289, 290.)

In view of the facts surrounding the challenge, we believe the court acted within the bounds of its discretion. Throughout his entire *voir dire* examination Mr. Johnson comes through as a frank, forthright and honest person. Although he was reluctant at first to serve as a juror, the record provides no basis for an assumption that he spoke untruthfully in saying he could render a fair verdict according to the law and the evidence; that he would follow the court's instructions and would return a "very large verdict against the estate" should he find plaintiffs entitled to a large recovery.

The defendant insists the trial court did *not* act arbitrarily in rejecting the plaintiffs' challenge for cause. To support this assertion the defendant directs our attention to the *voir dire* examination of another juror, Mr. Smith by name, who persistently adhered to his opinion that he could not be fair because of his relationship with the Minneys; that he was afraid he could not render a fair and impartial verdict; and that if he were Mr. and Mrs. Kidder, he would not want someone in his frame of mind sitting on the jury. In view of these emphatic responses to questions asked of him, Mr. Smith was properly excused for cause.

Finally, the plaintiffs do not question the qualifications of any juror who participated in the trial of this case. As we have said, Mr. Johnson was excused on a peremptory challenge, and we are given no reason to believe that the jurors finally selected to try the case were not fair and impartial. The general rule is set forth in 47 Am. Jur. 2d, Jury, § 218, p. 807, in this language:

"The exercise of a peremptory challenge by means of which a juror is excluded is generally deemed to waive an error committed by the trial court in previously ruling on a challenge of such juror for cause. . . ."

Under all the attending circumstances we are unable to say the plaintiffs were denied a fair trial because their challenge for cause against Mr. Johnson was not sustained.

We are aware of *Naylor v. Railway Co.,* 66 Kan. 407, 71 Pac. 835, which the plaintiffs have cited. That case is readily distinguished from the case at hand on the facts. There, the plaintiff was a nonresident. There, the challenged juror stated that he was prejudiced against a nonresident plaintiff who sued for personal damages in a court of this state when he might have brought the action in the courts of his own residence, and that he would require more evi-

dence of the plaintiff where that was the case. The situation depicted in *Naylor* is not comparable to the one before us now.

In our opinion no prejudicial error has been made to appear in this case and the judgment of the court below is affirmed.